# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-409


**STATE OF LOUISIANA**

**VERSUS**

**SIDNEY MYERS**


**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 119690-F
HONORABLE CHUCK R. WEST, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Van H. Kyzar, Judges.


**CONVICTIONS AND SENTENCES AFFIRMED.**

**Beau James Brock**
**Lori Palmentier**
**Brock & Palmintier Law LLC**
**4608 Bluebonnet Blvd**
**Baton Rouge, LA 70809**
**(225) 999-1100**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Sidney Myers**

**Mark D. Plaisance**
**Marcus J. Plaisance**
**Plaisance Law, LLC**
**PO Box 1123**
**Prairieville, LA 70769**
**(225) 775-5297**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Sidney Myers**

**Honorable Trent Brignac**
**Thirteenth Judicial District Attorney**
**Chauncey J. Hesnor**
**Jacob B. Fusilier**
**Assistant District Attorneys**
**P. O. Drawer 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

Defendant, Sidney Myers, appeals his conviction of three counts of indecent behavior with a juvenile, a violation of La.R.S. 14:81, and his sentences of five years at hard labor on each count, which the trial court ordered be served consecutively.

## PROCEDURAL POSTURE

On March 24, 2021, Defendant was charge by bill of indictment with the following offenses:

Count #1: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Sexual Battery by committing a sexual battery upon Juvenile K.S. (DOB: 2.08.2006)[1]

Count #2: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Felony Carnal Knowledge of a Juvenile, and being a person who is seventeen years of age or older had sexual intercourse, with consent, with a person who is thirteen years of age or older but less than seventeen years of age, when the victim is not the spouse of the offender and when the difference between the age of the victim and the age of the offender is four years or greater

Count #3: Sidney Myers, on or between January 1, 2020 and November 12, 2020, being a person over the age of seventeen, did intentionally entice, aid, solicit, or permit any child under the age of seventeen to perform any sexually immoral act.

Count #4: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

Count #5: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

---

[1] In accordance with La.R.S. 46:1844(W), we use the initials of the victim and her family to protect the victim's identity.

Count #6: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

Count #7: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

Count #8: Sidney Myers, on or between January 1, 2020 and November 12, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

contrary to the law of the State of Louisiana and against the peace and dignity of the same.

On May 1, 2023, the day Defendant's trial was to begin, an amended bill of indictment charged Defendant with:

Count #1: IN THE PARISH OF EVANGELINE, the defendant, Sidney T Myers, on or between August 1, 2020 and October 30, 2020, committed the offense of Sexual Battery by committing a sexual battery upon Juvenile K.S. (DOB: 2.08.2006)

Count #2: IN THE PARISH OF EVANGELINE, the defendant, Sidney Myers, on or between April 15, 2020 and October 30, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

Count #3: IN THE PARISH OF EVANGELINE, the defendant, Sidney Myers, on or between May 15, 2020 and October 30, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S.

(DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

Count #4: IN THE PARISH OF EVANGELINE, the defendant, Sidney Myers, on or between June 1, 2020 and October 30, 2020, committed the offense of Indecent Behavior with Juveniles upon Juvenile K.S. (DOB: 2.08.2006), by the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons

This May 1, 2023 trial resulted in this court declaring a mistrial. In *State v. Myers*, 23-275 (La.App. 3 Cir. 5/5/23) (unpublished writ), Defendant sought review of the trial court's denial of a mistrial because the State posed a hypothetical question to venire members during voir dire. The trial was halted while Defendant sought supervisory relief. This court held that the hypothetical question was not appropriate. We granted Defendant's request for a mistrial and remanded the case for further proceedings.

Thereafter, Defendant filed a motion to quash the indictment on the grounds that continued prosecution subjected him to double jeopardy. This motion to quash was denied. Defendant then sought writs to this court, which were denied, as were writs to the Louisiana Supreme Court. *State v. Myers*, 23-469 (La.App. 3 Cir. 8/3/23) (unpublished writ), *writ denied*, 23-1035 (La. 8/4/23), 368 So.3d 1099.

Trial commenced on August 7, 2023. On the second day of trial, a controversy arose regarding a prospective juror, Rachel Mendel Ardoin, a registered nurse working at a dialysis center, who had treated K.S.'s grandfather three days a week for several years. She knew K.S.'s parents "pretty well." K.S. and her son "played

3

ball together."  Mrs. Ardoin had heard rumors involving indecent behavior that involved K.S.  However, she believed she could be fair.

The defense traversed Mrs. Ardoin.  She understood that K.S.'s grandfather would be in the courtroom during trial.  Counsel asked:

> If you saw someone sitting over here okay, he was charged with something and someone who over here like yourself was a potential juror who cared for the wellbeing of -- of that persons [sic] family do you think that, would you want someone like you sitting on a jury judging some of your family?

Mrs. Ardoin replied, "Not necessarily but I do know some of the defense's family too.  I don't know the defendant but I know some of the people that he has in the courtroom with him also."  She admitted that her relationship with the family might possibly impair her ability if she had to sit through the testimonies of the family members she knew.

The traversal continued in the trial court's chambers.  Again, Mrs. Ardoin said her impartiality might be affected.  "I think it would affect my working ability with my patient. . . . Not from me I can be fair and impartial, but I think if I went the way he didn't want me to, he would have a problem."

The trial court was swayed by the fact that K.S.'s grandfather was only one of twelve patients Mrs. Ardoin would treat at a time.  In the end, however, Mrs. Ardoin affirmed that she could be fair and impartial.  Defendant moved that Mrs. Ardoin be stricken for cause, which the trial court denied.  Supervisory writs to this court were denied.  *State v. Myers*, 23-502 (La.App. 3 Cir. 8/10/23) (unpublished writ).

During trial, K.S.'s parents (henceforth Mr. S. and Mrs. S.) informed the State that K.S. had sought counseling from a second mental health professional.  Defendant moved for a mistrial on the basis of the State violating its discovery

4

obligations. This motion was denied, and writs of supervisory review were sought.

The application was denied:

> **STAY DENIED; WRIT DENIED:** Defendant filed a writ application with this court seeking supervisory review of the trial court's August 16, 2023, denial of Defendant's "Motion to Request Mistrial Under La.C.Cr.P. Art. 775, the United States Constitution and the Louisiana Constitution." The defense asserts the State suppressed information and violated discovery by providing the information too late for the defense to alter its strategy. Mistrial for a discovery violation is a drastic remedy, and there has been no showing of a discovery violation on behalf of the State. *See* La.Code Crim.P. arts. 718, 719, and 729.3; *see also, State v. Andrews*, 19-68 (La. 1/14/19), 260 So.3d 1202.
>
> Defendant further requests a mistrial based upon the argument that the late provision prejudiced the defense. "A mistrial may be ordered, and in a jury case the jury dismissed, when: . . . [t]here is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law . . . ." La.Code Crim.P. art. 775(3). The defense argues its inability to access the counseling records at issue prejudiced its pretrial preparation, voir dire, opening statement, and cross-examination of witnesses. As noted by the trial court, the information about the victim's counseling shows no discussion or counseling about the facts of the case and, therefore, no impeaching, inculpatory, or exculpatory remarks. As there has been no showing of a suppression of material evidence, there has been no violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). *See State v. Brown*, 16-998 (La. 1/28/22), 347 So.3d 745, *cert. denied*, ___ U.S. ___, 143 S.Ct. 886 (2023). Thus, there has been no showing of legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law.
>
> Therefore, this court finds no error in the trial court's ruling. Accordingly, Defendant's writ application is denied.

*State v. Myers*, 23-525 (La.App. 3 Cir. 8/17/23) (unpublished writ).

Defendant was ultimately found guilty as charged for the three counts of indecent behavior with juveniles and not guilty of sexual battery. Defendant filed motions for new trial and for post-verdict judgment of acquittal, both of which were denied prior to sentencing. On December 4, 2023, the trial court sentenced Defendant to five years at hard labor on each of the three counts of indecent behavior

with juveniles; additionally, the trial court ordered that the sentences run consecutively.

On December 13, 2023, Defendant filed a "Motion to Reconsider Sentence" in which he asked that his sentences be run concurrently, arguing his age and the fact the crimes "were perpetrated upon the same person, and were part of a common plan or scheme concerning the minor." On January 8, 2024, Defendant filed a "Motion for New Trial" on the grounds that one of the six jurors in his case, Joseph Fontenot, testified during voir dire that he did not know anyone in law enforcement and that he himself was not in law enforcement despite being a member of the Evangeline Parish Sheriff's Posse, which entitled him to carry a commission card and badge.

A hearing on both motions was held on March 29, 2024. The trial court denied the "Motion to Reconsider Sentence" before hearing testimony regarding the "Motion for New Trial." Prior to Mr. Fontenot testifying, he was informed that lying under oath was perjury, a felony offense, and informed of his rights to an attorney and to avoid self-incrimination; however, the State explicitly stated it would not charge him with perjury. Following testimony in which Mr. Fontenot claimed that, because the jury questionnaire asked if anyone in his "immediate family" was in law enforcement, he answered no because he did not think the question was referring to himself, only to his family member, the trial court denied the "Motion for New Trial." The trial court specifically noted that the question being argued over was number twelve on the jury questionnaire and clarified that the question was "do any of your immediate family members work in law enforcement or in the court system?" Due to the wording, the court found that Mr. Fontenot did not commit any omission "intenti[on]ally or otherwise."

On appeal, Defendant raises six assignments of error: (1) the prosecutor improperly vouched for the credibility of his witnesses, (2) the trial court improperly denied his challenge for cause as to juror Rachel Ardoin based on her status as a dialysis nurse who treats the victim's grandfather, (3) Defendant's second trial should have been barred by double jeopardy since the first mistrial was based on the State's misconduct during voir dire, (4) the trial court erred in denying Defendant's request for a mistrial when the victim's evidence disclosed additional information to the State after trial had begun, (5) Defendant should have received a new trial because juror Joseph Fontenot did not disclose his membership in the Evangeline Parish Sheriff's Posse during voir dire, and (6) there was insufficient evidence to support his convictions.

## ANALYSIS

*Law of the Case Doctrine*:

Defendant has sought relief from this court from the trial court's rulings on his original mistrial, the trial court's refusal to quash the indictment after mistrial, and after the trial court refused to strike Mrs. Ardoin for cause. Because these issues are raised in this appeal, it behooves us to discuss the doctrine of law of the case.

The doctrine of law of the case applies at the trial and appellate court levels.

> With regard to an appellate court, the "law of the case" refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.

> Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt

7

as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.

*Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.*, 260 La. 325, 330–31, 256 So.2d 105, 107 (1971) (footnotes omitted).

In *Davis v. Jazz Casino Co., L.L.C.*, 03-276 (La. 6/6/03), 849 So.2d 497, the supreme court reversed a court of appeal's dismissal of an appeal on the issue of the certification of a class after a separate panel denied writs on the same issue. In a per curiam, the supreme court held:

> The court of appeal erred in holding its earlier writ denial resolved the issue presented on appeal. In *Bulot v. Intracoastal Tubular Services, Inc.*, 02-1035 (La. 6/14/02), 817 So.2d 1149, we held that once a court of appeal declines to exercise its supervisory jurisdiction by denying the writ, the court was without jurisdiction to affirm, reverse or modify the judgment of the trial court. Thus, any language in the court of appeal's earlier writ denial purporting to find no error in the trial court's certification ruling is without effect.

*Id*. at 498. We note, however, that in deciding whether to exercise supervisory jurisdiction in a matter, this court conducts a thorough review of the issues presented. Thus, any statements that follow the declination of jurisdiction reflect language akin to dicta, which can be persuasive authority. Moreover, just as a law review article, treatise, or official comments regarding code articles may technically be "without effect," writ language may still possess the ability to elucidate, explain, or convince. Therefore, simply because the words following the denial are not binding, that does not mean, as Defendant urges, that this court "should not give any credence to any language accompanying the denial"; we cannot pretend the words do not exist. Yet, we must review the writ denials at least to the extent that they do not demonstrate palpable error or accomplish manifest injustice.

8

*Assignment of error 3*:

We will first address Defendant's assignment of error regarding double jeopardy. Defendant contends, "A person whose initial trial is reversed because of prosecutorial misconduct cannot be tried a second time." Defendant argues that because his first trial ended in a mistrial based on the State's use of an improper hypothetical during voir dire, he is immune to prosecution a second time under the principle of double jeopardy. As noted, this issue was addressed pre-trial, wherein this court rejected Defendant's argument. *See Myers*, 23-469. As discussed in the prior assignment of error, this court has already addressed this issue, and Defendant neither alleges the ruling was "clearly erroneous" nor provide any argument that this court's ruling was wrong.

Defendant again raises the argument he raised pretrial, namely, that the State's improper hypothetical caused his mistrial, so he should be immune from prosecution. This is despite acknowledging that "[w]hile [*Oregon v.*] **Kennedy**[, 456 U.S. 667, 102 S.Ct. 2983 (1982),] and the few cases from Louisiana that have considered this issue remain in favor of the re-trial approach[.]" His only argument is that the fourth circuit affirmed the grant of a motion to quash where the prosecutor intentionally brought out impermissible other crimes evidence, resulting in a mistrial. *See State v. Johnson*, 95-2626 (La.App. 4 Cir. 11/27/96), 684 So.2d 554. The *Johnson* court simply stated, "The trial judge did make a factual finding that the prosecutor's conduct was intentional and not an inadvertent error. We cannot say he abused his discretion." *Id*. at 557. Defendant does not allege that the prosecutor in the instant case intentionally caused the mistrial; instead he poses the hypothetical claim that "[o]therwise, the State could see its case falling apart, trigger a mistrial by 'accident,' and force an unlimited number of successive retrials."

Despite filing a reply brief to address the State's argument on this issue, Defendant still does not allege that the State intentionally posed an improper hypothetical but instead continues to argue that any time the State causes a mistrial, the defendant should be free from retrial. Simply put, Defendant cites a case where the court found the prosecutor's actions were intentional and thus barred retrial, to argue that this court should ignore the question of whether the prosecutor's actions were intentional. This argument is illogical and asks this court to ignore established jurisprudence just to benefit him. After reviewing the arguments by Defendant, we conclude that no manifest injustice will occur by relying on the ruling in Defendant's writ; thus, we decline to revisit the trial court's denial of Defendant's motion to quash.

*Assignment of error 6*:

Defendant contends in his sixth assignment of error that the evidence was insufficient to support his convictions. Because a determination in Defendant's favor on this issue would obviate the remaining assignments of error, we will shift our analysis to it. *See State v. Hearold*, 603 So.2d 731 (La.1992).

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a

10

> conviction, the elements of the crime must be proven
> beyond a reasonable doubt.
>
> *State v. Freeman*, 01-997, pp. 2–3 (La.App. 3 Cir. 12/12/01), 801 So.2d
> 578, 580.
>
> Furthermore, the testimony of a single witness is sufficient to
> support a conviction "[i]n the absence of internal contradiction or
> irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-
> 1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of
> fact may accept or reject the testimony of any witness, and the
> determination of the credibility of that witness, in whole or in part, is
> left to its sound discretion and "will not be re-weighed on appeal." *Id.*
> at 936.

*State v. F.B.A.*, 07-1526, pp. 1–2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009

(alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138. In order to

assess the sufficiency of the evidence, we must recount the evidence adduced.

The State's first witness was Deputy Duane Jorden of the Evangeline Parish

Sheriff's Office. Deputy Jorden, a detective when the initial complaint against

Defendant was made in 2020, was assigned to investigate. According to Deputy

Jorden, he spoke with K.S.'s parents first, then contacted the Child Advocacy Center

(CAC) in Alexandria, Louisiana, which is responsible for conducting forensic

interviews of juveniles, to schedule an interview of K.S.

K.S. was fourteen at the time of the complaint and interview. Deputy Jorden

observed the CAC interview via video while it occurred but found it hard to

understand K.S. because she was wearing a mask, per "pandemic protocols."

Deputy Jorden testified that he spoke with K.S. at the sheriff's office the day

after the CAC forensic interview to address his inability to understand K.S. during

the video interview. Deputy Jorden noted that K.S.'s parents were present during

the interview at the sheriff's office but did not believe they were attempting to coach

her or dictate her answers.

11

After the second recorded interview, Deputy Jorden visited the victim's family business, where the offenses were alleged to have occurred. Deputy Jorden testified that the back end of the family's property contained sheds for storage of the victim's father's planes and farming equipment, noting that the victim's father was a farmer and crop duster.

While reviewing photographs that he took at the family's property, Deputy Jorden pointed out that of the sheds that held a plane and an RV, which K.S. later told them was the location of one of the incidents between herself and Defendant. The photographs were accepted as State's Exhibit 1 in globo.

Deputy Jorden then moved to an area referred to by the victim's family as "the gully," stating that it was on a dirt road behind the family property. While Deputy Jorden was at the gully with the parents, the victim joined them on a side-by-side. K.S. showed Deputy Jorden multiple places where Defendant, whom K.S. called "Mr. Johnny," would go and drink. Deputy Jorden gave the following description of the area:

> It's a dirt area with gullies and in the gullies, I did see a turtle trap and when you walk a little bit further down, it's a wooded area. [] inside the wooden [sic] area it's like a -- appeared to be a -- tracks, [] and that's where the -- Mr. Johnny would park his vehicle, his four-wheeler.

Deputy Jorden identified a number of photographs that he took of the gully area, including a few showing beer bottles from Defendant and tire tracks that he described as consistent with an ATV. Deputy Jorden testified that neither of K.S.'s parents attempted to influence his investigation while examining the scene. According to Deputy Jorden, no rape kit or DNA was collected from the victim due to the delayed reporting. Deputy Jorden noted that it was possible to see Defendant's home, located down a dirt road near the gully, from certain parts of the wooded area.

12

According to Deputy Jorden, K.S. seemed nervous and reluctant to speak with strangers during her CAC interview; however, when she met with him the following day, she was a little more comfortable. He described her as "a lot more comfortable[]" when he spoke with her at the gully area. Deputy Jorden testified that he interviewed K.S. an additional time alongside Deputy Casey Johnson, a female officer. Again, K.S.'s parents were present, although not in the same room.

The State then published State's Exhibit 3, K.S.'s first CAC interview, to the jury.

The video of K.S.'s first interview was from November 16, 2020, when she was fourteen, and lasted twenty-eight minutes. When asked about why she was at the CAC, K.S. referred to "Mr. Johnny Myers" and stated that it started with him hugging her when he saw her at "the shop," then he would kiss her on the head, then it "expanded." She clarified "the shop" was her father's shop where he kept his plane and farm equipment, noting Defendant was an employee of her dad. She stated the first time she remembered Defendant kissing her on the head was around six or seven months prior to the interview.

According to K.S., Defendant got hurt, then after he returned to work, he kissed her on the lips while they were between two of the sheds on her family's property. K.S. stated that she had been riding around on a motorbike, and when she stopped, Defendant came over and kissed her. She did not remember if he said anything afterward. She then stated he said, "good night." She stated that for four or five days, they would meet on the farm road, and he would kiss her, and they would talk. K.S. stated that Defendant began touching her breasts, noting once was with her clothes on and twice were under her clothes. She stated these occurred on different days.

13

In describing the first time Defendant touched her breasts, K.S. stated that Defendant was kissing her on her breast area and touching her under her clothes. K.S. stated she took her shirt off while Defendant was trying to touch her under it, that he then took his shirt off, then it ended, and she returned home. She stated he did not have her do anything to his body. K.S. indicated that on another occasion Defendant kissed her on the breast then "put his head" between her legs, both with and without clothes. She clarified that he was kissing the inside of her legs/thighs. Again, she stated Defendant had his shirt off, and all she did to him was kiss him on the lips. She described the event as occurring around when the sun was setting. K.S. stated that Defendant told her he "was fixed" and described his wife as "a bitch."

K.S. stated that her parents found out about the relationship shortly before the interview and stated the last time she saw Defendant was less than two weeks before the interview. She stated that Defendant kissed her on her breasts on four or five separate occasions and that he kissed her on the thighs on two occasions, once with clothes on and once without. She claimed the only other place he touched her was on her thighs. She stated Defendant never took off more than his shirt.

Deputy Jorden's November 17, 2020 interview with K.S. was also published to the jury. K.S. said that she did "not really" feel uncomfortable the first time Defendant kissed her. She indicated that she would ride down the dirt road, and Defendant would come meet her because he could see dust flying from where she was riding. She stated that the first two times Defendant met her, he kissed her but nothing else. Then the next time, she indicated that Defendant kissed her on her breasts, on the skin, after she took her shirt off. She stated he did not touch her anywhere else "that time." K.S. stated that she and Defendant did not discuss sex. She then indicated that "the next time," she took all of her clothes off, on her own,

14

and Defendant kissed her on her thighs. K.S. stated that Defendant never touched her below the waist, aside from the kisses on her thighs.

Defendant told her he would treat her "like a queen" and that he would never hurt her. She repeated that he never did any more than kiss her between her thighs and on her breasts. She stated that when he was kissing her thighs, she told him to stop, and he stopped without saying anything. K.S. stated that she told her sister and another friend that Defendant had kissed her but that she did not go into any other details. After her father mentioned her telling her parents about it, K.S. stated that Defendant had at some point told her he was going to divorce his wife and marry her.

Deputy Jorden testified that K.S. was much more open and talkative when he subsequently met the family at their property to examine the areas where K.S. and Defendant had met. Deputy Jorden testified that no one ever told him it would be inappropriate to interview a juvenile victim multiple times or to send her for a second CAC interview, which also occurred in this case. Deputy Jorden noted that, between November 17, 2020 and subsequent interviews, he spoke with K.S.'s sister, her brother, her friend, and her maternal grandmother. He reported that the grandmother told him about catching Defendant hugging and kissing K.S.

K.S.'s second interview at the CAC was on March 19, 2021, roughly four months after her initial interview. Again, K.S. reported that physical contact between her and Defendant began with him hugging her every day, then progressed to kisses on the forehead, to kisses on the cheeks, to kisses on the lips. This time, however, K.S. stated that Defendant took her shirt off and began touching and kissing her breasts. She also reported him touching her on the inside of her thighs.

K.S. then stated that she and Defendant went to the gully, where Defendant removed her pants and kissed her thighs. She also stated that the first time this happened, Defendant put his fingers inside her "private part." According to K.S., on a separate occasion, Defendant put his fingers inside her "private part" then "put his private part inside [hers]." K.S. stated that the last time she saw Defendant at the gully, he just took her shirt off and touched and kissed her breasts. She also stated that Defendant "kissed her under the shed" when she subsequently saw him at her father's shop. She also claimed that Defendant told her that he was "fixed," could not have kids, and that he could not get her pregnant. She also stated that Defendant "pulled his pants down" on at least two other occasions. K.S. also noted that she believed her grandmother, her "Mimi," saw Defendant kiss her on another occasion after he delivered hay. K.S. told the interviewer on that occasion that Defendant had told her he "wanted to throw [her] on the hay and take all of her clothes off." She testified that incident was a few days before Defendant put his fingers inside her the first time.

K.S. stated that the first time Defendant removed her clothes was at the intersection between the shop and the gully. K.S. stated it was not a planned meeting; he was just there when she was riding around the property. She stated that she stopped her side-by-side to speak with Defendant, who then approached her, took her shirt off, lifted her bra, and sucked on her breasts. She stated that he did the same thing a few days later when he kissed on her thighs and put his fingers inside her. A few days later, at the gully, Defendant again put his fingers inside K.S. before putting his "private part" inside her as well. K.S. clarified that Defendant put his penis inside her and that it was "uncomfortable." K.S. testified that Defendant stopped because he got a cramp "in his butt cheek," and then both of them left the

gully area.  She also stated this was the occasion where Defendant called his wife a bitch and said he wanted to marry K.S.

K.S. stated that she was in her parents' RV one day listening to music when Defendant came inside, and they kissed on the lips.  K.S. stated the first time something happened was after Defendant had injured his ribs.  She also claimed the last time something happened was three days before her parents found out.  She indicated the relationship lasted around a year.  She clarified that Defendant only put his penis inside her on one occasion.  According to K.S., she was wearing jeans and a t-shirt the day Defendant put his penis inside her.  She believes that on the other occasion where he put his fingers inside her, she was wearing shorts.  K.S. stated that on the occasion where Defendant put his penis inside her, he took off her shirt while she took off her pants and underwear all at once.

Afterward, K.S. noticed blood in her underwear, so she washed all of her clothes.  According to K.S., nothing came out of Defendant's penis, nor did he have anything on it.

K.S. stated that she had not seen Defendant since her parents found out about the relationship.  She stated that her parents found out because she had told a friend about the interactions with Defendant, and the friend's mother looked through her phone.  K.S. stated that Defendant kissed her on the lips inside the rice tractor during rice season.  K.S. stated that she felt Defendant kissed her every couple of days.  She recalled Defendant putting his tongue in her mouth once, before the incidents at the gully.  She also stated he had one hand under her shirt and his other arm around her waist.

K.S. stated that Defendant gave her a bottle of strawberry wine as a gift, which he hid behind some things in the refrigerator at the shop so she could drink it.  She

17

said that Defendant claimed he would have slept with her at her house if he had been allowed to do so during the hurricane; however, he did not sleep at the house. K.S. related a story about Defendant telling her that his wife was going to be at work for three days and inviting her to go to his house and shower with him, but she did not go. According to K.S., Defendant would always remove her shirt and bra when he felt her breasts, noting it happened more than twice.

On cross-examination, Deputy Jorden acknowledged that his rank had been demoted from Captain at the time of the initial complaint to Sergeant at the time of trial. Deputy Jorden testified that he spent about seven years in the criminal investigation division before switching to traffic, noting that although he investigated a few juvenile sex crimes prior to the instant case, he was never given any training on interviewing juvenile victims. Deputy Jorden also acknowledged that when he interviewed K.S.'s older sister, she told him that K.S. always said that she was joking about Defendant and also that K.S. would make up stories that were impossible and could not have happened.

Deputy Jorden testified that he again interviewed K.S. on November 18. And that, K.S.'s parents took her for a medical examination the next day. He noted, however, that neither he nor anyone else from the Evangeline Parish Sheriff's Office attended the examination. Deputy Jorden also acknowledged that the report prepared by the nurse practitioner indicated that K.S. had reported no prior sexual activity, and the nurse found no evidence of prior sexual activity.

Deputy Jorden acknowledged that, after Defendant posted bail on the initial charges for which he was arrested on November 19, 2020, he sought a new arrest warrant to increase the charges against Defendant. He acknowledged that the affidavit for arrest was virtually identical to the original warrant and that no

additional information had been obtained between the initial arrest and the subsequent arrest, he simply added additional counts.

In response to defense counsel's questions about the November 18, 2020 interview, Deputy Jorden identified State's Exhibit 6, a recording of the interview conducted by himself and Deputy Casey Jorden on November 18, 2020, which was published to the jury.

In State's Exhibit 6, K.S. stated the relationship between herself and Defendant began with him hugging her, then a few weeks later, he started kissing her on the head. Later, it progressed to him touching and kissing her breasts with her clothes off. She stated the incidents where she took her clothes off happened at the gully. She stated Defendant would also take his shirt off. She then noted that she would take her pants off, and Defendant would kiss the inside of her thighs. She also stated that he stuck his fingers inside her "private part," which she clarified was her vagina. She then stated that he put his "private part" inside her vagina but stopped because it was uncomfortable. She stated they never tried that again. She also claimed that he kissed her once inside the truck while her dad was driving a "dozer." K.S. told the officers that Defendant always gave her a "regular" kiss, that he did not open his mouth or put his tongue in her mouth.

She again told the story that Defendant had put a bottle of wine in the shop refrigerator for her. At Deputy Johnson's prompting, K.S. claimed that Defendant would ride in the tractor with her while harvesting rice and would kiss her while touching her thigh whenever her father's combine was facing away from them. She also confirmed a story her father had related to law enforcement about a time when she was driving the truck, with Defendant inside. They were behind her dad,

19

following slowly, and she clarified it was because she stopped the truck for Defendant to kiss her.

K.S. claimed that the incident where Defendant put his penis inside her occurred about a month before the interview. She told Deputy Jorden that nothing happened between her and Defendant at the RV aside from him, kissing her. She also stated that Defendant, when he met her at the gully, would hide his four-wheeler so that her parents could not see that he was there. K.S. also repeated the claim that Defendant called his wife "a bitch," and that her Mimi saw Defendant kiss her on the lips when he delivered hay and told her he wanted to throw her on the hay and take off all her clothes, although he did not do it.

K.S. clarified that Defendant kissed her on the thighs, while her clothes were on. Once, she stated, Defendant kissed her on the thighs without her clothes, put his fingers inside her, and put his penis inside her all on the same occasion.

The State's next witness was K.S. A hearing was conducted pursuant to La.Code Evid. art. 601 to determine her competency. Her testimony was substantively consistent with the interviews she gave at CAC and to Deputies Jorden and Johnson. In addition to the pertinent details of the Defendant's behavior, K.S. admitted to lying to her grandmother about her and Defendant, as well as her younger sister. She admitted that she did not tell the nurse who examined her about Defendant.

On cross-examination, K.S. testified that she sometimes talked about boys with a friend and one of her sisters; during those conversations she would talk about what happened between herself and Defendant but would always claim she was joking when pressed by the other girls. She acknowledged that Defendant never told her to keep the relationship a secret.

20

Scott Fontenot, the Chief Deputy of the Evangeline Parish Sheriff's Office, testified that he became involved in the case when he sat in on a recorded interview between Deputy Jorden and Defendant, which was subsequently published to the jury.

In the interview, Defendant confirmed that his name is Sidney John Myers but acknowledged that "Johnny" was his nickname. Defendant began by stating that he and K.S. "were friends" but that they did not have a "relationship." He stated that he went to the gully area "almost every day." He and K.S. would just sit and talk when she met him. According to Defendant, he would park his four-wheeler in the woods because he did not like leaving it where people could see it; however, he struggled to identify anyone, other than the family, who might be near the area.

Defendant claimed that he never went to the gully to meet K.S., that he was often there before she was. Deputy Jorden then told Defendant that he "was seen" with K.S. with indecent behavior happening. When asked about described by K.S., Defendant said "absolutely nothing" happened during many of them. He did, however, admit that he "got a hug" and maybe a kiss on the cheek when he delivered hay to K.S.'s grandmother. Defendant told Deputies Jorden and Fontenot that the only physical contact between himself and K.S. was hugs and kisses on his cheek. Deputy Jorden then told Defendant that "someone" had reported seeing him touching K.S. on the legs, her breasts, and having sex with her. The deputies repeatedly told him that he was facing twenty-five to ninety-nine years in prison. Defendant outright denied most of the things that K.S. claimed he said or did and maintained that he was falsely accused. Defendant claimed that he "wasn't the predator"; he "was the one being stalked." He claimed that every time he went somewhere during work, K.S. would follow him.

On cross-examination, Deputy Fontenot testified the interview of Defendant was the only interview in which he participated in the instant case.

Corporal Tib Guillory, an agent with the Department of Wildlife and Fisheries Enforcement Division, testified that he was familiar with the setting and operating of turtle traps. Agent Guillory testified that he often received calls from private citizens to check on possible illegal hunting, fishing, and trapping. In November of 2020, he received such a call from Mr. S. regarding turtle trapping on his property. Agent Guillory testified that he and another officer found a single turtle trap in the "gully" area that had been described by prior witnesses. According to Agent Guillory, the trap they found was not connected to anything on the bank, as would be typical; however, there was dry-rotted, nylon string attached to one of the trees. Agent Guillory testified the trap was standing up as opposed to laying in the water, so it would not have caught anything because nothing could get into it. He opined the trap had likely been unattended "for weeks or maybe even months." On cross-examination, Agent Guillory testified based on its orientation and condition, no one could have been trapping turtles with the trap he found.

Ms. Twila Trahan, Mr. S.'s former secretary, testified that K.S. often rode her bike or four-wheeler to the office where she worked near the airplane hangar and would chat with the employees. Ms. Trahan recalled an incident where K.S. gave her a hug as she was leaving, and Defendant told K.S. she forgot something while tapping his cheek, and K.S. gave him a kiss on the cheek.

The State then called K.S.'s maternal grandmother, who related the story of the day Defendant drove a truck full of hay to her horse farm, noting that she, Defendant, and K.S. were in the horse barn about fifty feet away from where other workers were stacking the hay. K.S.'s grandmother started walking toward where

22

the hay was being stacked, then turned back around to find Defendant and K.S. "embraced." "They both had their arms both arms, around each other." She also testified that Defendant and K.S. were "giving each other a kiss" and that they quickly disengaged when she turned around and looked at them. K.S.'s grandmother testified that she "just thought it was odd" and spoke to K.S. about the situation. K.S. told her that she and Defendant "give each other a kiss and a hug every day." She stated that she did not mention the episode to K.S.'s parents because K.S. explained the situation satisfactorily.

During trial, an issue arose regarding K.S.'s counseling records. As a result, a hearing was held outside the presence of the jury regarding K.S.'s counseling history; specifically, the fact that her father informed the State during trial that K.S. had seen a counselor regarding her relationship with Defendant. According to Mr. S., the victim's father, K.S. had begun to see Ms. Candase Martel in February of 2023. Mr. S. testified that K.S. saw Ms. Martel for "family counseling," stating that "I don't even know what's been talked about, to be honest with you." He did note, however, that he informed Ms. Martel of the issues with Defendant during intake. He stated many times that the purpose of the counseling was to help K.S. with her anxiety over her parents' divorce. He also noted the counseling was for both K.S. and her younger brother. Furthermore, he indicated that he disclosed to the State for the first time during trial that K.S. had seen Ms. Martel. Mr. S. reiterated that K.S. was not brought to counseling for sexual abuse but to deal with family issues arising from his divorce.

Mrs. S., K.S.'s mother, was then called and testified that, as far as she was aware, the only two counselors K.S. had spoken to were Mary Dean and Candase

23

Martel. She stated she did not know what type of therapy K.S. was receiving because "[Mr. S.] did not consult [her]."

Prior to trial resuming, Defendant filed a motion for mistrial based on the State's disclosure, less than an hour after learning about the issue, that K.S. had begun to see Ms. Candase Martel for family counseling in February of 2023. Defendant argued the mid-trial discovery of additional counseling records for K.S. created a legal defect which would render any trial outcome reversible as a matter of law. Specifically, Defendant argued that knowing about the additional counseling "would have changed our v[oi]r dire[,] we would've changed our opening, we would have changed our cross examination techniques [sic] in this matter to include these issues." The trial court ultimately denied the motion for mistrial, finding no intentional suppression of evidence by the State and, furthermore, finding no evidence that was material, exculpatory, or impeaching. Defendant sought review with this court and, as previously noted, received no relief. *Myers*, 23-525.

Mrs. S. testified that she knew Defendant because he had worked for her husband for roughly five years. At some point in 2020, she observed Defendant and K.S. sitting in the back of a dusty truck and when K.S. stood up, Defendant began "rubbing her butt and dusting off her backside." Mrs. S. testified that she did not confront either person but noted that "something wasn't right about that. He should not have felt comfortable enough to touch my daughter [sic] butt." She believed the incident took place sometime in June.

According to Mrs. S., as the summer went on, she noticed K.S.'s behavior change, as K.S. spent large amounts of time bathing and sleeping, stopped eating with the family, lost weight, and started having "black circles under her eyes." Mrs. S. also related a time when she was bathing and K.S. asked her questions about

whether a man could "be fixed" and told her Defendant had a conversation with her in which he told her he was fixed "like her dad," and that did not sit well with her.

Mrs. S. confronted Defendant about his relationship with K.S. She wore K.S.'s favorite hoodie and drove K.S.'s side-by-side down the road leading to the gully. Defendant showed up to meet her. She testified that Defendant denied any relationship with K.S. Asked if she was angry, Mrs. S. responded, "I was angry and I uh, I told him that I would -- that I would cut his [explicative] [explicative] off and shove it down his own [explicative] throat and he just sat there and not -- didn't say anything, just looked at me. No explanation, nothing." Mrs. S. testified that neither she nor her ex-husband ever threatened or pressured the Sheriff to pursue charges against Defendant.

On cross-examination, Mrs. S. acknowledged never relating the story about Defendant touching K.S.'s butt to law enforcement prior to trial. She stated that no one ever asked her to give a recorded or written statement. She disagreed with defense counsel's characterizations of her "interrogating" K.S. or "flanking her in an interview." Mrs. S. testified that she was not present when K.S. told a nurse that she had no prior sexual activity.

Although Mrs. S. attributed K.S.'s withdrawal during the summer of 2020 to a relationship with Defendant, she acknowledged that she and her husband's marriage was dissolving and there were serious conflicts within the family.

Mrs. S. acknowledged that, prior to trial, K.S. met with members of the District Attorney's Office several times to prepare, both at the office and at the family home. Mrs. S. testified that K.S. made a mistake when she testified that she had never been to counseling, as she had seen two counselors; however, she attributed K.S.'s mistakes to defense counsel's questioning. Mrs. S. testified that

25

the family had on-going family counseling but that they saw the counselor separately, so she could not say what K.S. spoke to her counselors about.

The defense then recalled K.S. for recross-examination. She testified that she met with members of the District Attorney's Office "two or three times" about her testimony prior to trial. She acknowledged that she had incorrectly stated that she never went to counseling, claiming that she "froze up" during questioning. K.S. then testified that she discussed "what happened to [her] with Mr. Johnny" with her first counselor, Ms. Mary Dean. Defendant then renewed objections regarding being surprised about counseling during trial and sought a mistrial, which was denied. The State and Defendant then entered a stipulation that "there is no evidence, no record at all" of K.S. receiving counseling for sexual abuse during her sessions with either Ms. Mary Dean or Ms. Candase Martel.

The State then called Mr. S. as a witness. Mr. S. testified that Defendant helped build the family house in 2010 before going to work directly for Mr. S. for about five or six years. According to Mr. S., the RV kept in the shed near the farm equipment and plane was "always unlocked." He related an incident that occurred in 2020 where he was talking with his workers about what needed to be done that day, noting that they were talking for thirty to forty-five minutes. He testified that he saw K.S. come out of the rear of the RV "with a worried look on her face." After fussing at K.S. and sending her back to the house, he noticed Defendant, whom he did not even realize was present that day, by the front of the RV. He testified that he was concerned because he was there for about forty-five minutes and did not see either of them during that time.

Mr. S. testified that he first learned about the allegations from his wife. He and Mrs. S. went to the Sheriff's Office the next day. After describing the location

of the gully, Mr. S. noted that the gully is concealed so that someone at his house could not see if someone was at the gully. Despite Ms. Martel's intake notes indicating that Mr. S. told her K.S. had seen a counselor for sexual abuse counseling, Mr. S. testified that he did not know of any counselor K.S. had ever spoken to regarding sexual abuse.

The State's next witness was Dana Batts, a nurse practitioner. Ms. Batts testified that she saw K.S. in 2020 for a wellness visit. She noted that the initial intake and history collection was done by an intake nurse, not herself. She noted that on the day of the exam, the intake nurse recorded K.S. as reporting she was not sexually active. She testified that no questions were asked relating to contact between Defendant and K.S. because that information had not been related to her prior to the wellness exam.

The State then rested.

Janice Myers, Defendant's wife, was called as his first witness. She testified that Defendant worked different jobs throughout their marriage, noting that he eventually obtained a residential contractor's license and operated a business building homes. In February of 2014, Defendant had a total knee replacement, then had multiple aneurysms near the end of his recovery. According to Mrs. Myers, the surgery to fix Defendant's aneurysms left him impotent. She testified that Defendant did not take medicine to treat his impotence because his doctors told him doing so could harm him or potentially kill him.

Mrs. Myers and Defendant had not had sex since 2014, and she has not seen Defendant attain an erection since. As a result of the aneurysm, Defendant did not work for three years, until he went to work for Mr. S. Mrs. Myers noted Mr. S.'s

airplane hangar "is about three quarters of a mile from where [she and Defendant] used to live."

Mrs. Myers testified that while working for Mr. S., Defendant typically went to work between 6:00 and 6:30 a.m. and typically got home by 5:00 p.m. during the winter; however, during the summer he was typically not home until 7:00 or 8:00 p.m. According to Mrs. Myers, she and Defendant would typically take care of their animals and discuss their days when he got home, then Defendant would go check his turtle traps in the bayou. She could not give a definitive answer to how often Defendant checked on the traps, although she indicated it was at least weekly. She testified that Defendant was typically dirty and smelly when he returned from the traps, particularly when he caught turtles or rebaited the traps.

Mrs. Myers testified that she found out about the allegations against Defendant on November 12, 2020, the day she buried her mother. She testified that, after Mr. S. and Mrs. S. confronted Defendant at the gully about the allegations, he came home upset, angry, and hurt. Mrs. Myers testified that later, Duane Jorden and another officer came to her home looking for Defendant, who was out hunting.

When Defendant got home, he went to the Sheriff's Office without an attorney to give a statement at which time he was arrested; Mrs. Myers was informed by Duane Jorden that Defendant had been arrested. Mrs. Myers testified that she filed for divorce:

> Because the officers lead [sic] me to believe that he -- they had hard evidence, they had video evidence, there is [sic] cameras that had caught him in the act of doing things to this little girl, [] and that he had uh a full confession. It was recorded, it was documented and that he did not want to speak to me or my family or even see us.

Mrs. Myers testified that she halted the divorce proceedings once she realized law enforcement had been lying to her. She testified that she and Defendant were still married and living in a new home.

Defendant testified on his own behalf. He believed he went to work for Mr. S. at the end of 2015. Defendant noted that, while working for Mr. S., he worked both in the airplane hangar and with farm equipment. Defendant testified that he would check his turtle traps two or three times a week, unless the gully was too flooded to reach them. He noted that, due to the fields all around the gully being flushed, the gully often flooded even without heavy rain. Defendant testified that the last time he checked his traps, they were not left in the condition in which Agent Guillory had found and photographed them.

According to Defendant, on the night they buried his mother-in-law, he went to check his turtle traps. He was leaving when Mrs. S. drove up on a side-by-side, got in his face, and started yelling at him about the things she claimed he did to K.S.; he noted Mr. S. was in his truck and had followed Mrs. S. to the gully.

Defendant testified that the victim's family kept horses behind the shed and that whoever was feeding them, typically K.S., would feed them from a bucket "under the shed." Although he often spoke with K.S. when she was feeding the horses, Defendant testified, the conversations were typically "five minutes maybe at the most" because he was working. He acknowledged that he would sometimes give her a hug or kiss on the cheek.

Defendant testified that his turtle traps were about one hundred yards back from the farm road. He also stated that K.S. would sometimes come back to where he was near the farm road but not all the way back to where his traps were. According to Defendant, he would typically talk with his wife after work, feed

animals, eat dinner, then go check his traps; he noted he almost always "had a cold Budweiser in hand" when he did so. He would drive his four-wheeler to the gully to check the traps. Defendant testified that he kept pliers, string, and a crawfish sack in a tray attached to the front of his four-wheeler for when he checked his traps.

Defendant testified that he never did "anything inappropriate" with K.S. and that he did not touch her privates or allow her to touch his. He acknowledged that the incident Mrs. S. reported happened but claimed he was touching K.S. purely to get the dust off her shorts. Defendant testified that he had not achieved an erection since his aneurysm-related surgery.

On cross-examination, Defendant acknowledged that K.S. was the only one of the family's five children whom he had ever hugged or kissed. Defendant did not know if K.S. always using the same ATV because there were multiple side-by-sides, multiple four-wheelers, and "everything was green." He did not recall if Mrs. S. was wearing a teal-colored hoodie when she confronted him, nor did he recall if K.S. often wore a teal-colored hoodie. He testified that when he delivered hay to K.S.'s grandmother, K.S. gave him a hug and a kiss on the cheek when he arrived but stated that his arms were not around her. Defendant denied that he and K.S. would "meet up" at the gully.

Defendant acknowledged that when he went to the gully, he would park his four-wheeler in the woods to keep it off the road. Defendant testified that he did not initiate the hug and kiss from K.S. in the presence of Twila Trahan. Defendant stated that he felt K.S. was stalking him like a predator because she was always following him around.

Defendant testified that the red flagging found nears the trees by the gully was his and was there to indicate where the traps were; however, he did not tie the string

30

from the trap to the same branches as the flagging, stating the string "would have been tied closer to the gully." He did not see any string in the pictures taken by Agent Guillory.

Amanda Chapoton was accepted, without objection, as an expert in the fields of forensic interviewing and counseling. Ms. Chapoton testified that the purpose of Child Advocacy Center interviews, to obtain an uninfluenced, unbiased interview with a child, is best served by minimizing or eliminating anyone discussing the allegations with the child before the interview takes place. Interviewing a child multiple times is a big concern and should be highly structured, noting that interviewers would often meet with the child without interviewing or questioning just to build rapport, then the actual interview could take place at a subsequent meeting.

Although Ms. Chapoton had some minor critiques of the initial CAC interview of K.S., she felt typical forensic interview protocol was generally followed. Ms. Chapoton testified that it is not unusual for a child, after a forensic interview, to then disclose additional details, either because they remember more things or because they were too nervous during the interview to reveal certain things. However, she noted "the proper procedure is everybody is on the phone, we call the CAC, we're back in there, [] ASAP with exact same interviewer and we follow the same procedure" as the first interview. Ms. Chapoton expressed concern about the "why" of the second interview, why it took place at all, why it was at the Sheriff's Office and not the CAC. Although she felt forensic interviews should not be conducted by someone in a uniform because it can give the impression the child is in trouble, she noted that "being an officer in itself [] is not problematic if they're trained." She was also confused by K.S.'s parents being present, noting that "parents

31

are never allowed in an interview [] at the Advocacy Center." She testified that the presence of parents during the interview can affect the child's statement for various reasons.

Ms. Chapoton noted that, in the interview K.S. gave at the sheriff's office, she was concerned and confused by Deputy Jorden jumping into questioning about the same information that was discussed the day before during the CAC interview. She was also concerned with the fact there was no mention of the prior day's interview at all. She also noted that Deputy Jorden repeatedly asked compound questions, did not clarify which part of a question an answer applied to, then kept on firing questions that were poorly worded, assumed information that had not been discussed previously, and may have confused K.S. She testified that she was taken aback when, without any discussion of sex prior or clarification as to what the term meant to the child, Deputy Jorden just asked, "did he have sex with you?" during the interview. She noted that, generally, K.S. was not allowed to give a narrative of what happened because Deputy Jorden was leading the questioning. She summarized the interview as having "more of an interrogation approach to it than a forensic interview approach."

Regarding the third interview, which was just two days after the first interview, Ms. Chapoton again was concerned about why there was another interview happening so soon, a question not answered during the interview. She was also confused as to why the interview was in a different location and why a female officer was introduced into the equation. She noted it greatly concerned her that they started off doing a CAC interview then proceed to do multiple additional interviews without any of the protocols utilized by forensic interviewers. Ms. Chapoton took issue with Detective Johnson immediately interjecting the word

"naked" into the interview, something which was not mentioned in either of the first two interviews. She noted, again, a failure to clarify words that were being used during the interview, to clarify how K.S. knew something was what she said it was. She was shocked by Detective Johnson introducing the term "vagina" into the conversation, again without clarifying what she meant, or the word having been mentioned during the two prior interviews.

Ms. Chapoton noted that Deputy Jorden then subsequently interjected "oral sex" into the conversation without clarifying what that meant or checking to be sure K.S. understood what he meant. She also noted the follow up questions were "very leading, it was very suggestive." She summed up the interviews:

> I think it makes it very difficult to know what's reliable information, the integrity of all of the information now has been jeopardized. [] [T]the reason we have protocols set up the way we do is so that if something new is added or if there's a difference again, we're using a line of questions to qualify that, so if let's say, [] the child had gone home and as I stated earlier, can happen, and either remembered something new or felt comfortable enough to, to disclose something new, [] and she's back in the interview, the interviewer would probably make that part of the interview. Can you tell me, why you didn't share this with me yesterday, and she would say why. But, can you tell me what reason you maybe had, she would clarify that again on film, because we know, right, we're trained to think like attorneys, we're trained to think like DCFS, we're trained to think like all of the professionals and what pieces of information are going to come into question [] later. So, we want them to clarify, you didn't tell me this yesterday, yet you said to me that this was everything, now you're telling me -- because we know that's going to come into question, so we want to give her the opportunity to explain herself and none of that was able to be done either.

Regarding the second CAC interview, held in March of the following year, Ms. Chapoton was confused as to why investigators went back to utilizing the CAC after previously ignoring protocol multiple times. She also noted that in the second CAC video, it is clear from the video that the interviewer is being repeatedly spoken

33

to by Deputy Jorden, directing and interrupting the interview via earpiece, which was not present in the first CAC interview. Her ultimate conclusion was that:

> I think unfortunately in a situation like this and it's very disheartening that it becomes more difficult to be able to say reliably where the truth begins and ends because some many [sic] things have been tainted in the way that things were asked and the multiple times over and over again and that's unfortunate.

The defense rested its case after Ms. Chapoton's testimony.

After a rebuttal focused entirely on trying to prove Mr. S. did not influence the way the Sheriff's Office handled the case, the jury heard closing arguments and received the case. As will be discussed below, Defendant had an issue with the State's closing argument. After deliberation, the jury returned a verdict of not guilty of sexual battery and three guilty verdicts regarding the indecent behavior with a juvenile charges.

In a relatively recent case involving indecent behavior with a juvenile, the Louisiana Supreme Court noted:

> To prove defendant guilty of indecent behavior with a juvenile, the State was required to prove defendant committed any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen with the intention of arousing or gratifying the sexual desires of either person. R.S. 14:81(A), (A)(1). The ages of defendant and the victim are not in dispute. In dispute is whether the evidence, when viewed in the light most favor [sic] to the State under the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), supports the jury's determination that defendant acted in a manner that was lewd or lascivious and intended to arouse his or [the victim's] sexual desires.
>
> "The word 'lewd' means lustful, indecent, lascivious, and signifies that form of immorality which has relation to sexual impurity or incontinence carried on in a wanton manner." *State v. Prejean*, 216 La. 1072, 1078, 45 So.2d 627, 629 (1950). "The word 'lascivious' means tending to excite lust, lewd, indecent, obscene, relating to sexual impurity, tending to deprave the morals in respect to sexual relations." *Id.* All manner of obnoxious behavior has been held to constitute "lewd and lascivious conduct." *See, e.g., State v. Robinson*, 43,063, p. 8 (La. App. 2 Cir. 2/13/08), 975 So.2d 853, 858 (defendant groped the victim,

34

called her "baby", and commented that he could not help himself); *State v. Guillory*, 07-0422, pp. 1-2 (La. App. 3 Cir. 10/31/07), 970 So.2d 670, 672 (teacher brushed a student's legs with papers and asked her if it tingled and how it made her feel "below"); *State v. Forbes*, 97-1839, pp. 3-4, 6-7 (La. App. 1 Cir. 6/29/98), 716 So.2d 424, 427 (finding a rational trier of fact can conclude defendant committed a lewd and lascivious act by reaching under the victim's t-shirt to touch her breasts and reaching into her underpants to touch the area below her naval near her vagina); *State v. Sturdivant*, 27,680, pp. 1-2 (La. App. 2 Cir. 2/28/96), 669 So.2d 654, 656 (a parent, while receiving a school tour, made sexual comments to a 13-year-old and then groped her); *State v. Kohl*, 524 So.2d 781, 784 (La. App. 3 Cir. 1988) (defendant's rubbing of his beard on crotch of sleeping victims sufficient to prove violation of R.S. 14:81).

Here, defendant hugged the victim and kissed her on the cheek, but did not touch her genitals. Although courts have found that mere kissing or hugging alone does not rise to the level of lewd or lascivious, *see, e.g., State v. Louviere*, 602 So.2d 1042 (La. App. 4 Cir.1992), *writ denied*, 610 So.2d 796 (La.1993), defendant engaged in a subtle but panoply of acts from which a jury, when viewing his conduct as a whole, could rationally find his behavior was lewd or lascivious. Notably, defendant also rubbed [the victim's] thigh, slapped her on her rear end, professed his love for her, and invited her to spend the night with him. While defendant argues that the State failed to rule out the reasonable hypothesis of innocence that by touching the girl he was merely trying to comfort an upset runaway, his verbal expression of his romantic feelings and his invitation to spend the night with him are at odds with that hypothesis. A reasonable alternative hypothesis is not one that merely "*could* explain the events in an exculpatory fashion," but one that, after viewing all of the evidence in a light most favorable to the prosecution, "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'" *State v. Captville*, 448 So.2d 676, 680 (La. 1984) (quoting *Jackson v. Virginia*). Finding that the court of appeal erred in substituting its appreciation for the totality of defendant's actions and statements in their context for that of the jury, we reinstate the conviction for indecent behavior with a juvenile. *See generally State v. Bugbee*, 34,524, pp. 7-8 (La. App. 2 Cir. 2/28/01), 781 So.2d 748, 755 ("Finding that an act is lewd or lascivious depends upon the time, the place and all of the circumstances surrounding its commission, including the actual or implied intention of the actor.") (further citation omitted).

*State v. Shaikh*, 16-750, pp. 2–4 (La. 10/18/17), 236 So.3d 1206, 1208–09.

The ages of Defendant and K.S. are not disputed. Whether, viewing the

evidence in a light most favorable to the prosecution, the State proved that Defendant

35

committed lewd or lascivious acts with the intent of gratifying himself or K.S. is the issue.

The testimony of K.S. establishes at least three incidents describing overtly sexual contact between herself and Defendant. Defendant characterizes K.S.'s testimony as inconsistent and contrary to the evidence as a whole and points out that the State's case rests wholly on K.S.'s testimony. The State counters that evidence in the form of tire tracks and beer bottle at the gully corroborate K.S.'s testimony. We disagree with the State's assertion that this evidence corroborates K.S. Beer bottles and tire tracks do not prove any liaison between Defendant and K.S. They only prove that Defendant rode his four-wheeler to the scene and drank beer. Defendant freely admitted this.

Defendant asserts that the violation of standard forensic interview protocols, the confusing and leading questions posed to K.S. during a string of interviews, and K.S.'s statement to the intake nurse at a wellness examination the day after she was interviewed by Deputy Jorden in which she denied previous sexual activity demonstrates her unreliability as a witness. However, the jury viewed all of K.S.'s interviews. Ms. Batts explained that the examination of K.S. was not for the purpose of determining whether K.S. had engaged in sexual activity. And the jury heard K.S.'s direct testimony from the witness stand about all she claimed had taken place and was able to observe her in order to get a better understanding of whether it felt she was lying or insincere.

It is the jury's prerogative to assess the credibility of the witnesses. *F.B.A.*, 983 So.2d 1006. Even Ms. Chapoton was clear that initial disclosure by a juvenile victim of every detail of such encounters is uncommon. Knowing the flaws in the State's investigation, having viewed all of the interviews, having heard K.S.'s live

36

testimony, and having listened to Defendant tell his version of what happened, the jury found K.S. to be credible enough that Defendant was convicted of three counts of indecent behavior with a juvenile. This court is not well positioned to second-guess the jury's credibility assessments. Viewing the evidence in the light most favorable to the prosecution, we conclude that it is sufficient to support Defendant's convictions.

*Assignment of error 1*:

Defendant complains that the prosecutor improperly vouched for the State's witnesses during rebuttal argument when he stated, "I won't put a witness on a stand that I think is lying." Louisiana Code of Criminal Procedure Article 774 provides, in pertinent part, "The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice."

The prosecutor's statement came in rebuttal after Defendant argued that K.S. was "scripted to tell vomit, if you will, what she needed to say to you to try to get a conviction."

In *State v. Willis*, 05-218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied*, 06-186 (La. 6/23/06), 930 So.2d 973, *cert. denied*, 549 U.S. 1052, 127 S.Ct. 668 (2006), the defendant was initially charged with multiple counts of aggravated rape, among other violent sex offenses, committed against his stepdaughter, C.M., when she was between the ages of ten and fifteen. During trial, the State dismissed one of the aggravated rape charges, and during closing argument, defense counsel claimed that the dismissal of the charge was evidence that the State overcharged Defendant. Additionally, the victim's mother was originally charged with numerous sex offenses against C.M., too, but was allowed to plead guilty to a single charge while

37

the rest were dismissed.  In closing, defense counsel contended the mother was lying and would say anything to get out of jail.  He also accused the victim of lying about everything to benefit her uncle, one of the defendant's business competitors.

In rebuttal, the prosecutor told the jury he dismissed the charge because he "would not call upon you as a juror to consider a charge of this magnitude if I wasn't fully convinced of it and if I couldn't prove it beyond a reasonable doubt."  *Id.* at 394.  Furthermore, regarding the claim that the victim's mother would say anything to stay out of jail, the prosecutor commented, "I don't know if you resent that or not but as a person, I do. Because it means that I would have to promote this, condone this."  *Id.*

This court found that the comments were not improper because they "came after a discussion of the testimony at trial and the prosecutor did not imply that he had personal knowledge of facts not presented to the jury which indicated the Defendant's guilt."  *Id.* at 397.  Additionally, we held that the comments about the dismissal of the charge "were made in order to rebut the statements made by defense counsel and appear to explain the prosecutorial process and the burden of proof."  *Id.* at 398.  We went on:

> "[A]n argument with regard to the credibility of a witness is proper where the credibility of the witness is in question and the facts bearing on the witness' credibility appear in the record. *State v. Sayles,* 395 So.2d 695 (La.1981); *State v. Procell,* 365 So.2d 484 (La.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979); *State v. May,* 339 So.2d 764 (La.1976); *State v. West,* 319 So.2d 901 (La.1975)." *State v. Brewer,* 38,515, pp. 9–10 (La.App. 2 Cir. 8/20/04), 880 So.2d 1005, 1011, *writ denied,* 04–2509 (La.2/18/05), 896 So.2d 27.  The credibility of J.W. and C.M. was clearly at issue in this case. The defense attorney pointed this out in his closing argument when he informed the jury that the case hinged on the credibility of C.M. and J.W.  Accordingly, a comment by the prosecutor in reference to their credibility was not improper.

*Id.* (alteration in original).

Defendant cites *State v. Kaufman*, 304 So.2d 300 (La.1974), in which the defendant was charged with the murder of a gas station attendant in the course of a robbery. The defendant asserted that the robbery and murder were committed by another. During his closing argument, the prosecutor said:

> "I don't believe that Willie Holmes, a friend of Kaufman, confessed to robbery and murder, unless it was true" (objection made by defendant), then immediately a reference to Delores Williams as yet a third participant in the killing (objection), then, "Gentlemen, my argument, when I speak in a personal way, my argument is based on the evidence, and believe me, that's right, I personally feel from the evidence that I have a case; *otherwise, I wouldn't be here, because it's within my power to be here or not be here*" (objection).

*Id*. at 307. The objections were raised as to the prosecutor expressing his opinion as to the defendant's guilt. Relying upon La.Code Crim.P. art 774, the supreme court held this argument improper, holding:

> Partly based upon this statutory prohibition (but also for reasons of fairness which extend beyond it), a prosecutor in Louisiana (as well as in almost all other American jurisdictions) is prohibited from expressing his personal opinion of the defendant's guilt in his argument to the jury. State v. Curry, 262 La. 280, 263 So.2d 36 (1972); State v. Landry, 262 La. 32, 262 So.2d 360 (1972); State v. Sercovich, 246 La. 503, 165 So.2d 301 (1964); 2 Marr's Criminal Jurisprudence of Louisiana, Section 664 (1923); 5 Wharton's Criminal Law and Procedure, Section 2083 (Anderson ed., 1967); Annotation, 50 A.L.R.2d 766 (1968). **Nevertheless, as these sources indicate, the expression of such an opinion by the prosecutor is often held to be nonreversible, if it is apparent to the jury that it is expressly or impliedly only based on the evidence presented to the jury rather than on personal knowledge of facts outside the record.**
>
> Wharton's cited above at p. 245, explains the underlying reason for this rule of most American jurisdictions: "It has sometimes been stated, in support of the foregoing rules or holdings, that the assertion of the prosecutor's belief, opinion, or knowledge constitutes an invasion of the province of the jury and a usurpation of its function to declare the guilt or innocence of the accused. This is, however, a merely technical or theoretical argument. **The more practical and substantial reasons or grounds of objection usually assigned are that the statement complained of injects into the case irrelevant and inadmissible matter or a fact not legally produced in evidence, and *adds to the probative force of the testimony adduced upon the trial the***

*weight of the prosecutor's personal influence, knowledge, professional opinion, or the influence of his official position.*" (Italics ours.)

*Id.* at 307–08 (emphasis added in bold). The court further noted that the offensive remark in the prosecutor's argument was the statement that he would not have prosecuted the defendant if he felt he had no case. "This type of argument is an attack on the presumption of innocence afforded all accused before our courts. It emphasizes the function of the prosecutor as an officer of government and tends to exploit it. Such an argument by the prosecutor is almost universally held to be objectionable." *Id.* at 308.

We find no incongruity between *Kaufman* and *Willis*. The distinction between the two cases is that in *Kaufman*, the prosecutor invaded the jury's province of determining ultimate guilt or innocence as opposed to the *Willis* prosecutor, who argued in favor of the witness's credibility, which had been questioned by the defense. This assignment lacks merit.

*Assignment of error 2*:

The second assignment of error addresses the trial court's refusal to dismiss Mrs. Ardoin as a juror for cause based upon her personal relationship with K.S.'s family and rumors she had heard in the community.

Challenges of jurors for cause is governed by La.Code Crim.P. art 797, which states:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> (1) The juror lacks a qualification required by law;
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he

40

declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

Louisiana Constitution Article 1, § 17 guarantees an accused's "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily."

> When a defendant uses all twelve of his peremptory challenges, an erroneous ruling of a trial court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. *See State v. Cross,* 93–1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; *State v. Bourque,* 622 So.2d 198, 225 (La.1993), *overruled on other grounds by State v. Comeaux,* 93–2729 (La.7/1/97), 699 So.2d 16. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges. *State v. Robertson,* 92–2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280; *State v. Ross,* 623 So.2d 643, 644 (La.1993). Therefore, to establish reversible error warranting reversal of a conviction and sentence, defendant need only demonstrate (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. *Cross,* 93–1189 at 6, 658 So.2d at 686; *Bourque,* 622 So.2d at 225.

*State v. Juniors*, 03-2425, pp. 7–8 (La. 6/29/05), 915 So. 2d 291, 304–05.

Louisiana Code of Criminal Procedure Article 797(3) (emphasis added) provides that a juror may be challenged for cause when "The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is *such that it is reasonable to conclude that it would influence the juror* in arriving

41

at a verdict[.]" Relationships—even by blood—will not suffice to disqualify a juror unless from the nature of the relationship one can reasonably conclude that it would influence the juror. *Juniors*, 915 So.2d 291. On the other hand, "a prospective juror's statement that he or she will be fair and impartial is not binding on the trial court. If the revealed details of the relationship are such that bias, prejudice or impartiality may be reasonably inferred, a juror may be properly refused for cause." *Id*. at 306–07. Indeed, "A challenge for cause *should* be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses *as a whole* reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Jones*, 474 So.2d 919, 926 (La.1985) (emphasis added), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906 (1986).

In *Juniors*, 915 So.2d 291, a juror was challenged because the prosecuting attorney was his landlord. The supreme court analyzed La.Code Crim.P. art. 797. Because the landlord/ tenant relationship is not one specifically mentioned in article 797(3), "the relationship does not appear to be inherently suspect." *Id*. at 308. A trial court's decision to not excuse a juror for cause is reviewed by an examination of the responses of the juror as a whole and determining whether it reveals an abuse of the trial court's discretion. *Id*.

In *State v. Brown*, 496 So.2d 261 (La.1986), the supreme court found (in dicta) that the trial court erred in denying a challenge for cause of a juror who knew the victim's parents and whose son dated the victim in high school. The juror said she would have difficulty facing the victim's family if she voted not guilty and was sure the relationship would influence her. The juror also stated it would be hard to be impartial and that her verdict would probably be affected. The supreme court held that even though the juror said she could give the defendant a fair trial, "it was

42

unrealistic to conclude that her relationship. . . would not affect her deliberations in reaching a verdict." *Id*. at 264. Likewise, the supreme court found the trial court erred in denying Brown's challenge of *another* juror when the juror's son played on the same baseball team as the victim's son. The juror stated that being on the jury would probably cause him problems the next summer at the ballpark.

In *State v. Guidry*, 18-867 (La.App. 3 Cir. 5/8/19), 271 So.3d 275, *writ denied*, 19-1363 (La. 7/24/20), 299 So.3d 66, the prospective juror's wife was the stepsister of the victim's father and had known the victim's father for over 30 years. The juror said the relationship would not influence him as he had never met the victim and did not know the victim's family well. This court distinguished *Brown* because the juror in *Guidry* unequivocally stated that his relationship with the victim's family was not close and that he could be impartial.

In *State v. Hamilton*, 12-204 (La.App. 3 Cir. 11/20/13), 127 So.3d 76, *writ denied*, 13-2925 (La. 5/30/14), 140 So.3d 1173, this court again distinguished *Brown* because the juror in *Hamilton* never declared that she could not be fair and impartial. The juror in *Hamilton* went to school with the deceased victim and saw him socially. The juror's father and the victim's father were good friends. The juror said, however, that she had not been in close contact with the victim's family for a while.

In *State v. Letulier*, 97-1360 (La. 7/8/98), 750 So.2d 784, the supreme court found the trial court properly excused a juror when the juror was close friends with the victim's daughter, and the juror's wife was a cousin of the victim's wife's son. The juror stated that he did not think he could be fair and impartial.

As discussed, this issue came before the court previously on writs. *State v. Myers*, 23-502 (La.App. 3 Cir. 8/10/23) (unpublished writ). This court ruled:

43

**WRIT DENIED; STAY DENIED:** Defendant seeks review of the trial court's August 7, 2023 denial of his challenge for cause of Juror Rachel Ardoin. "A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion." *State v. Dotson*, 16-473, P. 5 (La. 10/18/17), 234 So.3d 34, 39. "The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called 'rehabilitation'), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence." *Id*. We find Juror Ardoin demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Accordingly, we find no abuse of discretion in the trial court's denial of Defendant's challenge of Juror Ardoin. The writ application is denied, and the request for a stay is denied.

We find no demonstrable palpable error or manifest injustice in the writ panel's ruling. Mrs. Ardoin indicated that she could put aside her relationships, which she described as somewhat tenuous except for her treatment of K.S.'s grandfather. Further, the six-person jury, of which Mrs. Ardoin was a member, refused to convict Defendant of sexual battery. Accordingly, we find no merit in this assignment of error.

*Assignment of error 4*:

Defendant contends that "[a] mistrial is proper when the State provides exculpatory discovery several days into trial." Mr. S. disclosed midway through trial that K.S. had seen a second counselor, previously unknown to any of the attorneys. Following a hearing, the trial court found that there was no evidence that the counseling with the second counselor, Ms. Martel, was related to sexual abuse. Accordingly, the trial court held there was no *Brady* violation and no reason for mistrial. As previously noted, Defendant then took an emergency writ, contending he was entitled to a mistrial because the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763

(1972), when it failed to disclose the fact that K.S. had been seeing Ms. Martel. This court denied Defendant's writ of review, noting that there was no evidence of a *Brady* violation. *See Myers*, 23-525.

Defendant continues to refer to the State's "concealment of evidence, in violation of *Brady*." The problem with that sentiment is that it directly contradicts what actually happened at trial. There is no evidence to support the notion that the State withheld evidence. The State disclosed the existence of the second counselor the same day it found out about her, the day before the hearing. *Brady*, 373 U.S. at 87, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The evidence in this case clearly established that the State did not suppress anything, instead turning over the news of a second counselor immediately after discovery. There was no suppression; therefore, there was no *Brady* violation and no justification for granting a mistrial or going back now and granting Defendant a new trial. After reviewing the arguments by Defendant, we find no manifest injustice will occur by relying on the ruling in Defendant's writ. Thus, we decline to revisit the trial court's denial of Defendant's motion for mistrial.

*Assignment of error 5*:

Defendant contends he should be entitled to a new trial because "[a] member of the Sheriff's Posse should be stricken from the jury for cause." Following sentencing, Defendant learned that one of the jurors, Mr. Joseph Fontenot, "was a member of the Sheriff's Posse, carried a Sheriff's commission card and badge, and appeared in numerous photographs with the Sheriff." Defendant contends he is entitled to a new trial "[s]ince Fontenot failed to disclose these relationships with the

45

arresting entity and witness(es), Myers was never able to raise a cause objection or even use a peremptory challenge. The juror's concealment warrants reversal."

Defendant raised this issue for the first time in a "Motion for New Trial" filed on January 8, 2024, more than a month after he had been sentenced. Defendant's motion for new trial specifically invokes the language of La.Code Crim.P. art. 851(B)(4), which states that a new trial shall be granted when "[t]he defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment." Under La.Code Crim.P. art. 853(A), "a motion for a new trial must be filed and disposed of before sentence." Although the article contains two exceptions that allow either a one-year or three-year extension of time, neither applies to claims raised under La.Code Crim.P. art. 851(B)(4). Accordingly, Defendant's "Motion for New Trial" was untimely filed. This court will not review the trial court's ruling.

*Error patent*:

We are required to review all cases for errors that are patent on the face of the record. La.Code Crim.P. art 920. We find one such error.

The sentencing transcript reflects that Defendant received a five-year sentence on *each* of his three counts of indecent behavior with juveniles, to run consecutively. The court minutes do not reflect that a five-year sentence was imposed on *each* count, as stated in the sentencing transcript; rather, the court minutes state, "the Court sentenced the defendant to five (5) years hard labor with the Department of Corrections to run consecutive to each other."

"[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*,

00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, because the court minutes do not properly reflect the sentences as stated in the sentencing transcript, the trial court is instructed to amend the court minutes to reflect a five-year hard labor sentence was imposed on each count of indecent behavior with juveniles.

## DECREE

Defendant's convictions and sentences are affirmed. The district court is instructed to amend the court minutes to reflect a five-year hard labor sentence was imposed on *each* count of indecent behavior with juveniles.

## CONVICTIONS AND SENTENCES AFFIRMED.